IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

KATHLEEN ROBERTS, et. al.          :   CIVIL ACTION
                                   :
         v.                        :
                                   :
TOWNSHIP OF UPPER DARBY, et. al.   :   NO. 2:10-cv-190

MEMORANDUM ORDER

AND NOW, this 26th day of November 2012, upon consideration of Defendants' Motion for Summary Judgment (Doc. No. 11) and Plaintiff's responses thereto (Doc. Nos. 35, 36), it is hereby ORDERED that said Motion (Doc. No. 11) is GRANTED. The Clerk of Court is directed to close this matter for statistical purposes.

I.  Factual Background and Procedural History[1]

This case arises from the execution of a search warrant at 5239 Fairhaven Road in Upper Darby Township, Pennsylvania. The search warrant was executed on September 14, 2007, following an investigation by the Upper Darby Township Police Department Narcotics Division. Plaintiffs Kathleen Roberts ("Plaintiff" or "Roberts") and Michael Weyler[2] lived at the residence on the date of the search.

The events leading to the search began on or around September 10, 2007, when Captain

---

[1] Because this matter comes before us on Defendants' motion for summary judgment, we set forth the facts drawing all justifiable inferences in favor of Plaintiff. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986) (remarking that "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor" in resolving motions for summary judgment).

[2] Kathleen Roberts brought this claim on behalf of her minor son, Michael Weyler.

1

George J. Rhoades Jr. of the Upper Darby Township Narcotics Division received a phone call from an anonymous informant. (Doc. No. 12, Ex. C, at 19-21). The informant told Captain Rhoades that drugs were being used and sold at 5239 Fairhaven Road. She also stated that people were coming and going from the house throughout the early evening hours, and only staying for short periods of time. (Id. at 21, 24). The informant refused to provide her name, but Captain Rhoades testified that she sounded like an elderly woman who was "scared to death." (Id. at 29). The informant called Captain Rhoades again about two days later. She told Rhoades that the drug activity was still occurring at the residence, and a man by the name of Charles Weyler lived at the house.[3] (Id. at 54-55).

In the same week that the elderly woman called, Captain Rhoades received a phone call from a second informant.[4] Similar to the elderly woman, the second informant told Captain Rhoades that drugs were being used and sold at 5239 Fairhaven Road. (Doc. No. 12, Ex. C, at 115). She also told Captain Rhoades that the residents had guns inside the house. (Id.). That same week, Detective Arthur Earle informed Captain Rhodes that he had also received information that cars were frequently driving by 5239 Fairhaven Road, and that drug activity was apparently occurring in front of the residence. (Id., at 180-81; Ex. G, at 73-74).

In response to the information he received, Captain Rhoades conducted a "trash pull" to

---

[3] Charles Weyler is Plaintiff's ex-boyfriend and father of Michael Weyler. Charles Weyler owned 5239 Fairhaven Road until his death in 2004. The house was not transferred to Plaintiff's name until sometime after 2006. (Doc. No. 12, Ex. B, at 25-28).

[4] In his deposition, Captain Rhoades could not provide specific dates or times as to when he spoke to the informants. According to his testimony, the informants called sporadically throughout the week leading to the search on Friday, September 14, 2007.

2

determine whether the trash discarded from 5239 Fairhaven Road provided any likelihood of drug activity. (Doc. No. 12, Ex. C, at 136). Around 3:00 a.m., on September 14, 2007, Captain Rhoades obtained four trash bags from 5239 Fairhaven Road. The bags were located inside a trash bin, which had been left out on the curb for removal. (Doc. No. 12, Ex. A, Ex. C, at 133-135). Upon searching the trash contents, Captain Rhoades found mail addressed to 5239 Fairhaven Road, as well as a newspaper photograph of Mike Weyler. Captain Rhoades also found several items in the trash indicative of drug activity including two small black bags commonly used to package marijuana, one large "zip lock" bag commonly used to hold smaller bags that hold marijuana, and cigar tobacco and wrappers.[5] One of the small black bags contained "green leaf" residue, which ultimately tested positive for marijuana. (See Doc. No. 12, Exs. A, C at 34-37, K).

Based on the foregoing information, Magisterial District Justice Kelly A. Micozzie-Aguirre approved a search warrant on September 14, 2007, permitting the Upper Darby Township Police Department to search 5239 Fairhaven Road for controlled substances, devices, and drugs. (Doc. No. 12, Ex. A; Doc. No. 35, ¶ 1). Captain Rhoades was the affiant for the search warrant. Later that evening, the following members of the Upper Darby Police Department executed the search warrant: Superintendent Michael Chitwood, Captain Rhoades, Captain Anthony Paparo, Detective Earle, Officer William McGoldrick, Officer Philip Lydon, Officer William Sminkey and Lieutenant Tom Johnson. (See Doc. No. 12, Ex. C, at 67).

---

[5] Captain Rhoades testified that marijuana users will frequently empty a cigar and fill the cigar tube with marijuana, and then smoke the marijuana "blunt" cigar. (Doc. No. 12, Ex. A, C, at 34).

When the police arrived at 5239 Fairhaven Road, Captain Anthony Paparo knocked on the door several times. (Id. at 83). He stated that the police were outside and had a warrant to search Plaintiff's residence. Because Plaintiff never answered the door, the police used a "battering ram" to force entry into Plaintiff's residence. (Id.) Plaintiff claims she never heard any knocking at her door before the police entered her residence.

When the officers entered, they had their handguns drawn. (Id., at 97-98). One of the officers pushed Plaintiff Roberts to the ground, and another officer subsequently placed her in handcuffs. Those two officers then helped Plaintiff Roberts off the ground and placed her on a nearby mattress, where they showed her the search warrant. (Id., at 105). Plaintiff alleges that at least one gun was pointed at her head until she sat on the mattress. The officers then allowed Plaintiff Roberts' son, Plaintiff Michael Weyler, to sit next to his mother on the mattress. Plaintiff alleges that a gun was pointed toward Michael until he sat on the mattress. (Doc. No. 12, Ex. B, at 170-171).

As Plaintiff Roberts sat on the mattress, the police officers continued to search the premises. After Plaintiff Roberts continually told the officers that no drugs were located in the house, one of the officers allegedly called her a "f---ing liar" and another officer called her a "b--ch." (Doc. No. 12, Ex. B, at 113). Roberts was then moved from the mattress to the dining room.

While Roberts sat handcuffed in the dining room, Detective Earle located illegal contraband on top of the kitchen refrigerator. The contraband included marijuana, "glassine" bags, stems, and seeds. (See Doc. No. 12, Ex. G, at 56-67). Roberts was subsequently arrested.

4

Prior to transporting Roberts to police headquarters, a female officer searched Roberts in the kitchen area. (Doc. No. 12, Ex. B., at 192). The female officer conducted a thorough body search, but found no further contraband. (Doc. No. 12, Ex. M, at 14-15).

Plaintiff was charged with possession of a controlled substance and use/possession of drug paraphernalia. (See Doc. No. 12, Ex. O). The state court later nolle prossed the charges. (See Doc. No 12, Ex. O; Doc. No 35, at ¶ 60). During the criminal proceedings, Plaintiff moved to suppress the physical evidence. In her motion, Plaintiff alleged the search violated her rights under the Pennsylvania and United States constitution. (Doc. No. 12, Ex. N). The court denied Plaintiff's motion to suppress the evidence. (See Doc. No 6, at ¶ 54; Doc. No. 12, Ex. O).

On December 21, 2009, Plaintiff brought this civil suit against the Township of Upper Darby and members of its police force, seeking recompense for the injuries suffered as a result of the search on September 14, 2007. Plaintiff's complaint asserts both federal constitutional claims pursuant to 42 U.S.C. § 1983 and state law tort claims. Defendants filed this instant motion, arguing that they are entitled to judgment as a matter of law pursuant to Federal Rule of Civil Procedure 56(a). For the following reasons, we agree.

II.  Legal Analysis

A.  Summary Judgment Standard

Under Federal Rule of Civil Procedure 56(a), we must "grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Summary judgment is appropriate where "the nonmoving party has failed to make a sufficient showing on an essential element of her case with respect to which

she has the burden of proof." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). Accordingly, the nonmoving party cannot avoid summary judgment "merely by restating the allegations of his complaint, but must point to concrete evidence in the record that supports each and every essential element of his case." Orsatti v. New Jersey State Police, 71 F.3d 480, 484 (3d Cir. 1995) (citing Celotex, 477 U.S. at 322). "The mere existence of a scintilla of evidence in support of the [non-movant]'s position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-movant]." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986).

Here, Plaintiff failed to file a timely and complete response to Defendants' motion for summary judgment. (See Doc. Nos. 36, 37). A party moving for summary judgment is not entitled to summary judgment simply because the nonmovant did not oppose the motion. See E.D. Pa. R. Civ. P. 7.1(c); Anchorage Assocs. v. Virgin Islands Bd. of Tax Review, 922 F.2d 168, 175 (3d Cir. 1990). The Court will grant the motion if, based on the documents presently before us, the movant is entitled to judgment as a matter of law. See Fed. R. Civ. P. 56(e)(3).

B.  Fourth Amendment Claims

Plaintiff asserts a 42 U.S.C. § 1983[6] claim against named police officers, alleging several violations of her Fourth Amendment rights. In response, the police officers claim they are shielded from liability pursuant to qualified immunity. A state official with qualified immunity has no civil liability for discretionary conduct so long as he does "not violate clearly established

---

[6] 42 U.S.C. § 1983 provides: "Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law."

statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982). Thus, whether the police officers are entitled to qualified immunity requires a two-part inquiry. First, we will determine whether Plaintiff provides sufficient evidence to make out a constitutional rights violation. If so, then we will decide whether those rights were "clearly established" at the time of the incident. Pearson v. Calahan, 555 U.S. 223, 232 (2009).

    1.    Illegal Search Warrant

Plaintiff claims that the search of her house violated her Fourth Amendment rights because it was based on a deficient search warrant. (Doc. No. 6, at ¶ 63(a)-(b)). Defendants argue that any claims related to the constitutionality of the search warrant must be barred by the doctrine of collateral estoppel because the state court already considered that issue at the suppression hearing. We disagree.

Collateral estoppel generally precludes a party from relitigating issues or claims that have already been adjudicated. See Montana v. United States, 440 U.S. 147, 153-54 (1979). The Third Circuit has held that "defendants in a section 1983 suit can raise the issue of collateral estoppel where the plaintiffs attempt[]to relitigate in federal court issues decided against them in state criminal proceedings." Anela v. City of Wildwood, 790 F.2d 1063, 1068 (3d Cir. 1986). Under Pennsylvania law, collateral estoppel requires four elements: "(1) the issue decided in the prior adjudication was identical to the one presented in the later action; (2) there was a final judgment on the merits; (3) the party against whom the plea is asserted was a party or in privity with a party to the prior adjudication; and (4) the party against whom it is asserted had a full and fair opportunity to litigate the issue in question in a prior action." Walker v. Horn, 385 F.3d 321,

337 (3d Cir. 2004) (citing Shuder v. McDonald's Corp., 859 F.2d 266, 273 (3d Cir.1988)).

Here, the second element is not met because Plaintiff was never convicted of a crime. Rather, the trial court granted the Commonwealth's application for nolle prosequi. (See Doc. No. 12, Ex. M, O). A conviction for a crime is a final judgment; however, an order denying a motion to suppress is not. Because Plaintiff was never convicted, she never had the opportunity to test the propriety of the lower court's suppression ruling on appeal. Therefore, Plaintiff is not collaterally estopped from challenging the constitutionality of the search in this Section 1983 case. See Wilkinson v. Ellis, 484 F. Supp. 1072, 1088 (E.D. Pa. 1980); Jones v. Saunders, 422 F.Supp. 1054 (E.D. Pa. 1976).

We now turn to the substance of Plaintiff's claim. Plaintiff baldly asserts that Captain Rhoades' affidavit contained "materially false information." (Doc. No. 6, at ¶ 63(a)). "A section 1983 plaintiff who challenges the validity of a search warrant by asserting that law enforcement agents submitted a false affidavit to the issuing judicial officer must satisfy the two-part test developed by the Supreme Court in Franks v. Delaware, 438 U.S. 154, 155-56 (1978)." Sherwood v. Mulvihill, 113 F.3d 396,399 (3d Cir. 1997). Under Franks, "the plaintiff must prove, by a preponderance of the evidence, (1) that the affiant knowingly and deliberately, or with a reckless disregard for the truth, made false statements or omissions that create a falsehood in applying for a warrant; and (2) that such statements or omissions are material, or necessary, to the finding of probable cause." Id. (citing Franks, 438 U.S. at 171-72).

Here, Plaintiff has come forth with nothing more than naked allegations that Captain Rhoades lied about receiving anonymous phone calls and finding contraband in the trash pull. Notwithstanding these allegations in the complaint, Plaintiff Roberts later admits in her

deposition that she does not believe Captain Rhoades intentionally misrepresented any facts in the affidavit. (See Doc. No. 12, Ex. B, at 135-144). Therefore, Plaintiff fails to satisfy the first prong of the Franks test.

Plaintiff argues in the alternative that even if the information provided in the affidavit is truthful, it was based upon an illegal search of Plaintiff's trash. Specifically, Plaintiff argues that Captain Rhoades had no reasonable suspicion to support the trash pull, which violates the Fourth Amendment. It is well established, however, that the Fourth Amendment does not prohibit the warrantless search of garbage that is left out near the curb for trash collection. California v. Greenwood, 486 U.S. 35 (1988). Because Captain Rhoades needed no reasonable suspicion to search Plaintiff's garbage left at the curb, this claim lacks merit.

Plaintiff next argues that even with the evidence from the trash pull, the affidavit does not establish probable cause to obtain a warrant to search Plaintiff's home. Probable cause exists to support the issuance of a search warrant if, based on a totality of the circumstances, "there is a fair probability that contraband or evidence of a crime will be found in a particular place." Illinois v. Gates, 462 U.S. 213, 238 (1983). The existence of probable cause in a Section 1983 claim is generally a question of fact. Groman v. Twp. of Manalapan, 47 F.3d 628, 635 (3d Cir. 1995). "The district court may conclude in the appropriate case, however, that probable cause did exist as a matter of law if the evidence, viewed most favorably to Plaintiff, reasonably would not support a contrary factual finding." Sherwood, 113 F.3d at 401.

Here, Captain Rhoades received several phone calls about drug-related activity occurring in Plaintiff's residence. Based on those phone calls and his discussion with Detective Earle, Captain Rhoades inspected Plaintiff's trash, where he found several items indicative of drug

9

activity. These items included what ultimately proved to be marijuana. Plaintiff's trash also contained letters mailed to the Plaintiff's address, making it likely that the contraband originated from her residence. Given the totality of circumstances, no reasonable juror would conclude that there was not at least a "fair probability" that contraband was located in the Plaintiff's residence at the time of the search.

Drawing all justifiable inferences in Plaintiff's favor, she fails to provide any evidence that the search was based on a deficient search warrant in violation of her Fourth Amendment rights.

2. "Knock and Announce" Claim

Inherent in Fourth Amendment protection against unreasonable searches and seizures is the "commonlaw requirement that police officers entering a dwelling must knock on the door and announce their identity and purpose before attempting forcible entry." Kornegay v. Cottingham, 120 F.3d 392, 396 (3d Cir. 1997) (quoting Richards v. Wisconsin, 520 U.S. 385, 387 (1997)). Plaintiff claims that the police officers violated her Fourth Amendment rights because she did not hear them "knock and announce" their presence before they entered her residence.

The parties disagree over the events leading up to the police officers' entry of Plaintiff's residence. According to the testimony of all seven officers who participated in the search, Plaintiff Roberts was standing in her front yard when the police arrived at her house. (See Doc. No. 12, Ex. C, at 78-86; Ex. D, at 21-28; Ex. E, at 86-88; Ex. F, at 24-45; Ex. G, at 15-20; Ex. H, at 7-11; Ex. I, at 16-24). After the officers exited their vehicles, Roberts began walking swiftly toward her front door. As she walked, Captain Anthony Paparo approached her and said, "ma'am stop, police department, we have a search warrant." (Id., Ex. E, at 87). Captain Paparo

followed Roberts as she walked toward her front door. When Roberts reached her front door, Captain Paparo repeated his announcement. Roberts turned around and looked directly at Captain Paparo, but then entered her house and slammed the door closed.

According to the police, after Roberts entered the residence, Captain Paparo walked up to the front door. Detective Sminkey followed with a "battering ram" to force entry if necessary. Captain Paparo knocked on the door, and again yelled, "ma'am, we have a search warrant, we're going to come in, please open the door." (Id., at 88). The officers briefly waited, but heard no response. Just as Sminkey contacted the door with the ram, the door allegedly opened on its own, and Roberts was standing in the doorway.

According to Plaintiff's testimony, which we must accept as true for purposes of this motion, she was not outside when the police arrived. She claims she never saw the police approach her front door and never heard them knock and announce their presence prior to entering the residence. Rather, she claims that she was inside the house helping her son. While she was walking toward the kitchen she suddenly "heard a big bang through the door." (Doc. No. 12, Ex. B, at 94-95). She turned around to find that the police had entered her house.

Whether one hears is a function of proximity. Here, Plaintiff provides no evidence of her proximity to the front door at the time of police entry. She mentions walking from her living room toward her kitchen, but never describes the distance of those rooms from her front door. Moreover, Plaintiff testified that she did not hear any voices coming from outside prior to the entry. Given the number of officers present at the scene, such an admission suggests Plaintiff was not particularly close to the door. Regardless, the Court need not speculate. Plaintiff's naked assertion that she failed to hear the police knock and announce does not refute the officers'

11

testimony that they in fact did announce their presence; it establishes only that the Plaintiff did not hear the announcement. Because Plaintiff provides no evidence to establish a genuine dispute as to whether the officers knocked and announced prior to entering her residence, we deny this claim.

  3. <u>Improper Body Search</u>

  Plaintiff claims that the pat down search she received immediately prior to her transfer to the police station violated her Fourth Amendment rights because the police had neither reasonable suspicion or probable cause to conduct the search.[7] Plaintiff fails to recognize, however, that the search occurred after she was placed under arrest for the marijuana found in her kitchen. The Third Circuit has consistently held that "a search is permissible incident to a suspect's arrest when, under all the circumstances, there remains a reasonable possibility that the arrestee could access a weapon or destructible evidence in the container or area being searched." <u>U.S. v. Shakir</u>, 616 F.3d 315, 320 (3d Cir. 2010). "The permissible scope of a search incident to arrest includes the arrestee's person and the area within his immediate control—construing that phrase to mean the area from within which he might gain possession of a weapon or destructible evidence." <u>Id.</u> (quoting <u>Chimel v. California</u>, 395 U.S. 752, 762-63 (1969)) (internal quotation marks omitted). A search incident to arrest is generally proper even if the person is handcuffed at the time of the search. <u>See</u> <u>id.</u> (quoting U.S. v. Sanders, 994 F.2d 200, 209 (5th Cir)) ("Handcuffs are a temporary restraining device; they limit but do not eliminate a person's ability

---

[7] In her Complaint, Plaintiff asserts that Plaintiff Michael Weyler was also improperly searched in violation of the Fourth Amendment. However, Plaintiff fails to even mention the search later in her deposition testimony. In fact, the evidence indicates that the search never even occurred. Because bare allegations are not enough to survive a motion for summary judgment, we deny any Fourth Amendment claim related to the officers' search of Michael Weyler.

to perform various acts. . . . Albeit difficult, it is by no means impossible for a handcuffed person to obtain and use a weapon concealed on his person or within lunge reach. . . . Finally, like any mechanical device, handcuffs can and do fail on occasion.").

Here, the body search was valid because the existence of drugs in Plaintiff's kitchen created a reasonable possibility that the she may have had destructible evidence, such as additional drugs, hidden on her body. The search was appropriate in scope because it included only those areas on Plaintiff's person where she reasonably could have hidden destructible evidence, such as beneath her clothing or in her pockets. The government acknowledges that Plaintiff's undergarments were searched for possible drugs or weapons; however, it is undisputed that the female officer performing the search neither touched Plaintiff's breasts or performed any invasive cavity search. It is also undisputed that no male officer was present during the search. (Id.; Doc. No. 12, Ex. B, at 126-27, 192-93; see Doc. No. 35, at ¶ 45). In fact, Plaintiff admits in her deposition that there was nothing inappropriate about the search. (Doc. No. 12, Ex. B, at 127). In sum, Plaintiff provides no evidence to allow a reasonable juror to conclude that the officers' search incident to her arrest violated her Fourth Amendment rights.

4. Excessive Force

Plaintiff alleges that the police officers violated her Fourth Amendment rights when they pushed her to the ground, handcuffed her, and pointed their guns toward her direction. Plaintiff contends that she received bruises and a neck strain as a result of the incident.

"To state a claim for excessive force as an unreasonable seizure under the Fourth Amendment, a plaintiff must show that a 'seizure' occurred and that it was unreasonable." Kopec v. Tate, 361 F.3d 772, 776 (3d Cir. 2004) (citation omitted). "The test of reasonableness

13

under the Fourth Amendment is whether under the totality of the circumstances, 'the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivations." Id. (quoting Graham v. Connor, 490 U.S. 386 (1989)). "The 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." Graham, 490 U.S. at 396.

Moreover, the possession of a "warrant to search for contraband founded on probable cause implicitly carries with it the limited authority to detain the occupants of the premises while a proper search is conducted." Michigan v. Summers, 452 U.S. 692, 705 (1981). The Supreme Court has recognized that a temporary detainment "necessarily carries with it the right to use some degree of physical coercion or threat thereof to affect it." See Graham, 490 U.S. at 396. "'Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers,' violates the Fourth Amendment." Id. (citation omitted).

In her complaint, Plaintiff alleges that upon entry she was "violently thrown to the ground" by one of the police officers. (Doc. No. 6, at ¶ 18). In her deposition, however, Plaintiff agrees that she was not tripped to the ground or punched or kicked by any officer. (Doc. No. 12, Ex. B, at 99-100). In fact, Plaintiff admits that the officer merely applied pressure to her body to force her down to the ground to enable another officer to handcuff Plaintiff. (See id. at 97-103).

Although Plaintiff provides no evidence to identify the "pushing" officer, Defendants admit in their deposition that Officer Sminkey was the officer who had physical contact with Roberts upon entry. In his deposition, Sminkey explained that he was the first person inside the

residence to execute the search warrant, and his responsibility was to gain entry to permit the other officers to enter and secure the residence. Upon entry, he was immediately met by Plaintiff Roberts near the doorway. Because Officer Sminkey used the "ram" to open the door, he had no weapon drawn. With no way to defend himself in the event that Plaintiff possessed a weapon, he made the immediate decision to physically detain Plaintiff Roberts.

Under these circumstances, Officer Sminkey's decision to forcibly detain Plaintiff Roberts was objectively reasonable. The officers were entitled to detain Plaintiff pursuant to the search warrant. It was reasonable for Officer Sminkey to assume that temporarily detaining Plaintiff was necessary to ensure safety of all persons involved in the search of the residence. This is especially true in a drug raid, where the occupants are often armed. For that same reason, it was also reasonable for the officers to have their guns drawn throughout the search. See Baker v Monroe Twp., 50 F.3d 1186, 1191-92 (3d Cir. 1995) ("The dangerousness of chaos is quite pronounced in a drug raid, where the occupants are likely to be armed, where the police are certainly armed, and the nature of the suspected drug operation would involve a great deal of coming and going by drug customers."). Therefore, Plaintiff provides no evidence related to the officers' use of force of which a reasonable juror could conclude violated her Fourth Amendment rights.[8]

---

[8] Because we conclude that no reasonable juror could find that the officers' use of force was excessive or unnecessary, we also deny Plaintiff's state claim for assault and battery. See Renk v. City of Pittsburgh, 537 Pa. 68, 77 (1994) ("In making a lawful arrest, a police officer may use such force as is necessary under the circumstances to effectuate the arrest. The reasonableness of the force used in making the arrest determines whether the police officer's conduct constitutes an assault and battery." Therefore, a police officer will be held liable for assault and battery only where a jury could determine "that the force used in making an arrest is

5. <u>False Arrest</u>

Plaintiff claims that the police officers violated her Fourth Amendment rights because they arrested her without probable cause. "The proper inquiry in a section 1983 claim based on false arrest . . . is not whether the person arrested in fact committed the offense but whether the arresting officers had probable cause to believe the person arrested had committed the offense." <u>Groman v. Township of Manalapan</u>, 47 F.3d 628, 634 (3d Cir. 1995) (quoting <u>Dowling v. City of Philadelphia</u>, 855 F.2d 136, 141 (3d Cir. 1988)). "[P]robable cause to arrest exists when the facts and circumstances within the arresting officer's knowledge are sufficient in themselves to warrant a reasonable person to believe that an offense has been or is being committed by the person to be arrested." <u>Orsatti v. New Jersey State Police</u>, 71 F.3d 480, 483 (3d Cir. 1995).

Defendants arrested Plaintiff for possession of a controlled substance and possession of drug paraphernalia. In Pennsylvania, a person may be guilty of possession through the doctrine of constructive possession, which is often based on the totality of circumstances. <u>Com. v. Macolino</u>, 503 Pa. 201, 206 (1983). "Further, circumstantial evidence may be used to establish a defendant's possession of drugs or contraband." <u>Id.</u> Here, marijuana was found in the kitchen of the house where Plaintiff lived. Pursuant to Pennsylvania criminal law, no reasonable juror would conclude that the arresting officer did not have probable cause to arrest Plaintiff for possession of a controlled substance.[9] Therefore, Plaintiff's arrest did not violate her Fourth

---

unnecessary or excessive.").

[9] We deny Plaintiff's state claim for false arrest and false imprisonment for the same reasons. See <u>Renk v. City of Pittsburgh</u>, 537 Pa. 68, 76 (1994) ("An arrest based upon probable cause would be justified, regardless of whether the individual arrested was guilty or not.").

Amendment rights.

6. Malicious Prosecution

Our decision that probable cause existed to arrest Plaintiff for possession of a controlled substance also disposes of Plaintiff's Section 1983 claim for malicious prosecution. Plaintiff bases her malicious prosecution claim on alleged Fourth Amendment violations arising from her arrest and prosecution. To prevail on this claim, Plaintiff "must show that the officers lacked probable cause to arrest her." Wright v. City of Philadelphia, 409 F.3d 595, 604 (3d Cir. 2005). As already discussed, however, there was probable cause for Plaintiff's arrest and prosecution based on the information available to the officers at the time of her arrest.[10]

7. Qualified Immunity

Upon thorough consideration of each claim alleged against the named police officers, we conclude that Plaintiff failed to establish that any officer violated her constitutional rights. Because Plaintiff did not prove the existence of a constitutional violation, we need not determine whether those rights were "clearly established" at the time of the incident. Therefore, all named police officers are entitled to qualified immunity and shielded from civil liability.

C. Monell Claims

Plaintiff also asserts a Section 1983 claim against Upper Darby Township. In Monell v. New York City Dep't. of Soc. Servs., 436 U.S. 658, 691 (1978), the Supreme Court firmly held that "a municipality cannot be held liable under § 1983 on a *respondeat superior* theory." This

---

[10] We deny Plaintiff's state claim for malicious prosecution for the same reasons. See Kelley v. General Teamsters, Chauffeurs and Helpers, Local Union 249, 518 Pa. 517, 520-21; Manley v. Fitzgerald, 997 A.2d 1235 (Pa. Cmwlth. 2010) (denying malicious prosecution claim because officers had probable cause to arrest plaintiff).

means that the municipality cannot be sued for the harm caused solely by its employees or agents. Id. Instead, the plaintiff must demonstrate that the municipality's "policy or custom" ultimately caused his constitutional injury. Id. at 694.

For purposes of Section 1983, a policy is created when a "decisionmaker possess[ing] final authority to establish municipal policy with respect to the action issues an official proclamation, policy, or edict." Andrews v. City of Philadelphia, 895 F.2d 1469, 1480 (3d Cir. 1990) (quoting Pembaur v. City of Cincinnati, 475 U.S. 469, 481 (1986)) (internal quotation marks omitted). A plaintiff may show the existence of a custom by providing evidence of a "course of conduct, although not specifically endorsed or authorized by law, is so well-settled and permanent as virtually to constitute law." Bielevicz v. Dubinon, 915 F.2d 845, 950 (3d Cir. 1990).

Here, Plaintiff fails to provide even a scintilla of evidence that she suffered any constitutional harm caused by a policy or custom of the Upper Darby police department. Plaintiff merely lists different tasks allegedly performed (or not performed) by Upper Darby police officers throughout this case, and then concludes that these tasks constitute "police policies." (See Doc. No. 36, at 20). These alleged "policies" are nothing more than a description of action taken (or not taken) by individual police officers. Thus, not only does Plaintiff fail to provide evidence of any policy or custom, but she seems to base her Monell claims on *respondeat superior*. For those reasons, Upper Darby Township is entitled judgment as a matter of law.

D. State Claim for Intentional Infliction of Emotional Distress

The Third Circuit has consistently held that Pennsylvania recognizes the tort of intentional infliction of emotional distress ("IIED"). Weinstein v. Bullick, 827 F. Supp. 1193, 1203 (E.D. Pa. 1993). But see Ford v. Isdaner, 542 A.2d 137, 139 (Pa. Super. 1988) (holding Pennsylvania does not recognize the tort of intentional infliction of emotional distress). The Pennsylvania Supreme Court has noted that section 46(2) of the Restatement (Second) of Torts "set[s] forth the minium elements necessary" for a claim of intentional infliction of emotional distress. Taylor v. Albert Einstein Med. Ctr., 754 A.2d 650, 652 (Pa. 2000). The Restatement requires (1) "extreme and outrageous conduct" that (2) "intentionally or recklessly" (3) "causes" (4) "severe emotional distress." Restatement (Second) of Torts § 46(1) (1965).

"The gravaman of the tort of intentional infliction of emotional distress is outrageous conduct on the part of the tortfeasor." Corbett v. Morgenstern, 934 F. Supp. 680, 684 (E.D. Pa. 1996) (quoting Abadie v. Riddle Memorial Hosp., 589 A.2d 1143, 1145-46 (Pa. Super. 1991)). The act must be "so outrageous in character and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." Id. (quoting Johnson v. Caparelli, 625 A.2d 668, 672 (Pa. 1993)). "Under Pennsylvania law, it is for the court to determine in the first instance whether defendant's conduct can be reasonably regarded as so extreme and outrageous to permit recovery." Corbett, 934 F. Supp. at 684 (citing Cox, 861 F.2d at 395).

Presumably for purposes of establishing "outrageous" conduct, Plaintiff emphasizes that the police repeatedly called her a "f---ing liar" and a "b--ch" during the search. Outrageous conduct for purposes of establishing IIED "does not extend to mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities. . . . [P]laintiffs must necessarily be expected and required to be hardened to a certain amount of rough language, and to occasional acts that are

definitely inconsiderate and unkind." Kazatsky v. King David Memorial Park, Inc., 527 A.2d 988 (Pa. 1987).

Regardless, we are not required here to determine whether the officers' conduct reached the level of "outrageousness" that would support recovery because Plaintiff failed to establish a chain of proof. Pennsylvania bars recovery for emotional distress unless it is "accompanied by a physical injury or impact upon the complaining party." Id. (citations omitted). Here, Plaintiff alleges that she suffered back and neck injuries as a result of the search. Plaintiff claims that the injuries occurred when the officers threw her to the ground upon entry. However, Plaintiff later admits that she had been diagnosed with back and neck problems several years prior to the incident. (Doc. No. 12, Ex. B, at 33-38).

Plaintiff's allegation that the search caused her to suffer physical injury is completely bereft of supporting medical testimony. Moreover, Plaintiff acknowledges that her alleged physical injuries predated the search. Plaintiff offers no evidence of causation except conclusory and unsubstantiated averments. (See Doc. No. 12, Ex. B, at 33-74). "To permit recovery on the basis of such a questionable showing would necessitate a radical departure from settled principles of Pennsylvania tort doctrine." Kazatsky, 527 A.2d at 992. Therefore, we must deny Plaintiff's IIED state claim.

III. CONCLUSION

For the foregoing reasons, it is hereby ORDERED that Defendants' Motion for Summary Judgment (Doc. No 11) is GRANTED. The Clerk of Court is directed to close this matter for statistical purposes.

BY THE COURT:

/s/ Legrome D. Davis

Legrome D. Davis, J.